

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

JRS:AMR
F. #2022R00940

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

December 26, 2024

By ECF

The Honorable Diane Gujarati
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

   Re: United States v. Terrence Wise
      Docket No. 23-CR-9 (DG)

Dear Judge Gujarati:

  The defendant Terrence Wise is scheduled to be sentenced on January 9, 2025 following his March 15, 2024 pleas of guilty to one count of making and possessing a destructive device, in violation of Title 26, United States Code, Section 5861(d) (Count One), and being a felon in possession of a firearm, in violation of Title 18, United States Code, Section 922(g)(1) (Count Four). For the reasons that follow, the Court should impose a sentence of 105 months' imprisonment and three years' supervised release.

 I. Background

  A. Offense Conduct

  As set forth in the Presentence Investigation Report ("PSR"), on four occasions between November 4, 2022 and November 9, 2022, the defendant used gasoline and improvised incendiary devices to set fires and damage property in Brooklyn, New York. See PSR ¶¶ 5-10.

   1. November 4-7, 2022: the Defendant Throws Firebombs and Ignites Fires

  On the evening of November 4, 2022, the defendant picked up a bottle from the ground on Belmont Avenue in East New York, Brooklyn, and carried it into the driver's seat of a white U-Haul van ("the White U-Haul Van"). Id. ¶ 5. The defendant then filled the bottle with gasoline from a red container and placed toilet paper into the mouth of the bottle, creating an improvised incendiary device, also known as a "Molotov cocktail"—effectively, a homemade firebomb. Id. He then drove away from Belmont Avenue in the White U-Haul Van. Id. Several minutes later, he parked the White U-Haul Van and got out of the driver's seat holding the device, which was lit on fire. Id. ¶ 6. The defendant then threw his homemade bomb at a black

van parked on Glenmore Avenue (the "Black Van"), causing a burst of flames, and drove away after a shot was fired in his direction. Id. The image below shows the burst of flames the defendant caused when he threw the Molotov cocktail; the White U-Haul Van is indicated with a red circle near the top of the image.



Less than three days later, on the morning of November 7, 2022, the defendant again drove the White U-Haul Van onto the same block of Glenmore Avenue. Id. ¶ 7. Security camera video shows flames emerging from the front passenger side of the White U-Haul Van and landing on the Black Van, causing the Black Van to briefly catch fire. Id. (Police officers later found a shattered glass bottle—a container in which a Molotov cocktail can be made—on the ground next to the Black Van.) The image below shows the Black Van catching fire from another of the defendant's Molotov cocktails.



Approximately 10 minutes later, the defendant returned to the same block of Glenmore Avenue and brought a red gasoline container out of the driver's seat of the White U-Haul Van. Id. He carried the container toward the Black Van and remained behind it for approximately 20 seconds, during which time another fire ignited near the Black Van. Id. The defendant then got back into the White U-Haul Van and drove away. Id.

2. November 9, 2022: the Defendant Sets Fire to the White U-Haul Van

Two days later, on the evening of November 9, 2022, security video from the same area of Belmont Avenue that was shown on November 4, 2022—which includes audio— captured the defendant having a loud argument with another person, throwing a red gasoline container onto the ground and getting into the driver's seat of the White U-Haul Van. Id. ¶ 8.

2

The other person got into another van that rammed the White U-Haul Van, and the defendant emerged from the driver's seat in order to chase the other van with a bat in his hand. Id. After the other van drove away, the defendant announced, "Truck going on fire," and summoned another person to "Get that gas container. Get that gas container. Nobody's selling here. Bring that container. Get it quick." Id. He then used the red gasoline container to ignite a fire inside the White U-Haul Van, which expanded, damaging the White U-Haul Van for several minutes until it was ultimately brought under control by firefighters. Id. The image below shows the White U-Haul Van after the defendant set it on fire.



The White U-Haul Van was valued at $44,000. See Exhibit 1 (U-Haul Fair Market Value Affidavit).

### 3. December 2, 2022: The Defendant Flees from Police and Is Apprehended With a Gun

On December 2, 2022, police officers saw the defendant drive another U-Haul van through a stop sign near Miller Avenue and Livonia Avenue in Brooklyn. See PSR ¶ 9. When the officers approached the defendant, he refused to shut off the U-Haul van and drove into the car in front of him, struck a police car, and drove away at a high speed. Id. Police officers pursued him to the intersection of Flatlands Avenue and Fountain Avenue—over a mile from the initial stop sign infraction—where the defendant crashed into a light pole and yet another car, causing minor injuries to a civilian. Id. Police officers arrested the defendant and found a revolver in the U-Haul with its cylinder missing (a fact that the defendant later discussed in a lawfully recorded telephone call) and its serial number obliterated.

The defendant was then placed in a police car and driven to the 75th Precinct. When the police car arrived at the precinct, the defendant opened the car door and ran on foot while handcuffed, making it approximately 30 feet before he was apprehended again. PSR ¶ 9.

In a recorded call from a New York City jail on December 10, 2022, the defendant boasted about fleeing from the police and throwing a component of the revolver out of the window of the U-Haul during the pursuit. During the call, the defendant said the following, in substance and in part:

3

- "They took the small baby, but I still got the big brother, you heard? And if it look like they putting me away, that's where it's going. It's going to you. . . . They caught me with the little one."

- "Yo, I ran the police over and everything [laughing]. . . . I ran that [N-word] over. That [N-word] said, 'Yo, stop, get out the car, put your hand out.' I put one hand out, had the hand on the other joint, lit it, threw the bitch out the window, and told 'em, 'Yo, y'all might as well get the fuck out the way, cause I'ma meet y'all at my crib.' . . . I tore ass on 'em. They chased me for 35 minutes, bro."

- "The gun, the one that they got, I threw the barrel and the bullets. So, it's called a defaced. It can't—it's inoperable, so what you gonna charge me with, you get me? I threw the bullets like ten blocks away. So they gonna drop that down to a E felony, which is gonna break down to a A misdemeanor."

  B.  <u>Procedural History</u>

  On November 28, 2022, a complaint was filed charging the defendant with one count of arson, in violation of 18 U.S.C. § 844(i), and a warrant was issued for his arrest. <u>See</u> ECF No. 1. The defendant made an initial appearance on December 12, 2022 and was ordered detained. <u>See</u> December 12, 2022 Docket Entry. An indictment was filed on January 6, 2023 charging him with two counts of making and possessing a destructive device, in violation of 26 U.S.C. § 5861(d) (Counts One and Two), one count of arson, in violation of 18 U.S.C. § 844(i) (Count Three), and one count of being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1) (Count Four).

  On March 15, 2024, the defendant pleaded guilty to Counts One and Four pursuant to an agreement with the government. <u>See</u> March 15, 2024 Docket Entry. In his plea agreement, the defendant agreed not to appeal his conviction or sentence in the event that he is sentenced to a term of imprisonment of 188 months or below, regardless of the sentencing analysis the Court reaches, and the government agreed not to seek a sentence above 105 months. <u>See</u> Court Ex. 1 (Plea Agreement) ¶¶ 4 and 5.b.

  C.  <u>Criminal History</u>

  As the PSR indicates, the defendant has a history of felony convictions involving violence and the possession and use of weapons. In 1988, he was found in possession of a loaded firearm and wrestled with law enforcement officers while being apprehended. PSR ¶ 35. In 2000, he was convicted of attempted robbery in the first degree (using/threatening the use of a dangerous instrument) for hitting a person with a bat, breaking that person's arm, and stealing that person's gold chain. <u>Id.</u> ¶ 43. He was sentenced to five years' imprisonment and was released in 2004 to parole supervision, but his parole was revoked four times between 2005 and 2008: once for a technical violation, twice because of new arrests, and once because he was convicted of another felony. <u>Id.</u> That felony appears to be the defendant's 2008 conviction for burglary in the second degree (illegal entry into a dwelling). <u>Id.</u> ¶ 45. In that incident, the defendant slapped his then-wife in the face and placed furniture in front of the doors of a

dwelling, preventing her and two children from leaving. Id. He then fled from—and fought with—law enforcement officers. Id. The defendant was sentenced to seven years' imprisonment and was released in 2013 to parole supervision. Id. He again violated the terms of parole on two occasions: once for absconding and once for a new arrest.[1]

The PSR also lists seven misdemeanor convictions for the defendant for offenses committed between 1988 and 2020. See PSR ¶¶ 34, 37, 38, 42, 44, 46, 47. These include a conviction for possessing contraband in prison in 2007, id. ¶ 44, an assault conviction for punching a law enforcement officer in 2014, id. ¶ 46, and a 2020 conviction for criminal obstruction of breathing for punching his ex-fiancée, "plac[ing] his hands around the complainant's throat and appl[ying] pressure, causing the complainant to be unable to breathe and to begin to lose consciousness." Id. ¶ 47.

### D. The Defendant's Misconduct Within the MDC

On February 10, 2024, a correction officer at the Metropolitan Detention Center ("MDC") searched the defendant's cell and found an electronic device, two chargers (one of which was hidden in a plastic bottle), two stamps soaked in an unknown substance, and "two pieces of metal approximately 6.5 inches long sharpened to a point on one end and wrapped in cloths on the opposite end to form a handle." Ex. 2 (February 22, 2024 Discipline Hearing Officer Report) at 2-3. The defendant was the only occupant of the cell and admitted to possessing the weapons.[2] Id. at 1-2.

## II. Applicable Law

The Supreme Court has explained that a sentencing court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." Gall v. United States, 552 U.S. 38, 49 (2007). Next, a sentencing court should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. In so doing, [it] may not presume that the Guidelines range is reasonable. [It] must make an individualized assessment based on the facts presented." Id. at 50. Title 18, United States Code, Section 3553(a) provides, in part, that in imposing sentence, the Court shall consider:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant; [and]
>
> (2) the need for the sentence imposed—

---

[1] In addition to these felony convictions, the PSR also lists a 1998 conviction for criminal possession of a weapon in the third degree, which involved an unspecified weapon. Id. ¶ 41.

[2] The report indicates that the defendant stated, "I[']m guilty of the 104 and 108." Ex. 2 at 1. These two numerical codes refer to possession of a dangerous weapon and possession of a hazardous tool, respectively. See id. at 2.

      (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

      (B) to afford adequate deterrence to criminal conduct; [and]

      (C) to protect the public from further crimes of the defendant.

Section 3553 also recognizes the need to afford the defendant opportunities for rehabilitation. See 18 U.S.C. § 3553(a)(2)(D). Thus, the Court must first calculate the correct Guidelines range and then apply the Section 3553(a) factors to arrive at an appropriate sentence. The district court must also "remain cognizant of them throughout the sentencing process." Gall, 552 U.S. at 50 n.6.

### III. Guidelines Calculation

#### A. Offense Level and Criminal History Category

The government agrees with the Probation Office's calculation of the offense level, see PSR ¶¶ 14-32, and submits that the applicable Guidelines calculation is set forth below:

| | | |
|---|---|---:|
| | Base Offense Level (U.S.S.G. § 2K2.1(a)(4)(B)) | 20 |
| Plus: | Three to seven firearms (U.S.S.G. § 2K2.1(b)(1)(A)) | +2 |
| Plus: | Destructive device other than a portable rocket, missile, or device for use in launching a portable rocket or missile (U.S.S.G. § 2K2.1(b)(3)(B)) | +2 |
| Plus: | Firearm with altered or obliterated serial number (U.S.S.G. § 2K2.1(b)(4)(B)) | +4 |
| Plus: | Firearm possessed in connection with another felony offense (U.S.S.G. § 2K2.1(b)(6)(B)) | +4 |
| Plus: | Recklessly creating substantial risk of death or serious bodily injury in course of fleeing from law enforcement officer (U.S.S.G. § 3C1.2)) | +2 |
| Less: | Timely acceptance of responsibility (U.S.S.G. §§ 3E1.1(a) and (b)) | <u>-3</u> |
| | Total: | <u>31</u> |

With a criminal history category of III, an offense level of 31 yields an advisor Guidelines range of imprisonment of 135 months to 168 months.

6

B.   Counts One and Four Should Be Grouped Together

In his plea agreement, the defendant stipulated that the above Guidelines calculation is correct, "except that the defendant reserves the right to challenge whether, as a matter of law, Counts One and Four are grouped together as a single group pursuant to U.S.S.G. § 3D1.2(d)."  Court Ex. 1 ¶ 2.

Counts One and Four should indeed be grouped together pursuant to U.S.S.G. § 3D1.2(d), which provides that counts shall be grouped when "the offense level is determined largely on the basis of the total amount of harm or loss, the quantity of a substance involved, or some other measure of aggregate harm, or if the offense behavior is ongoing or continuous in nature and the offense guideline is written to cover such behavior."  The guideline specifically provides that offenses covered by (among other sections) U.S.S.G. § 2K2.1 "are to be grouped under this subsection."  Id.  Both Count One and Count Four are covered by § 2K2.1, as the parties have stipulated in the plea agreement.  See U.S.S.G. § 2K2.1 (specifying that the "Statutory Provisions" covered by this section include 18 U.S.C. §§ 922(a)-(p) and 26 U.S.C. § 5861(a)-(l).).  These counts should therefore be grouped pursuant to § 3D1.2(d).  The defendant's reliance on the Background Note to this section, which remarks that a "primary consideration in this section is whether the offenses involve different victims," is misplaced: the same application note goes on to make clear that "[c]ounts involving different victims (or societal harms in the case of 'victimless' crimes) are grouped together only as provided in subsection (c) or (d)."  U.S.S.G. § 3D1.2 Background Note.  Thus, the fact that the defendant's offenses involved different victims does not prevent the offenses from being grouped pursuant to § 3D1.2(d).

The cases the defendant cites do not support the argument that Counts One and Four should not be grouped.  In some of those cases, the counts of conviction "involve[d] 'offenses to which different offense guidelines appl[ied],'" United States v. Doxie, 813 F.3d 1340, 1345-46 (11th Cir. 2016) (declining to group a fraud offense covered by U.S.S.G. § 2B1.1 with a tax offense covered by § 2T1.1); see also United States v. Goncalves, 613 F.3d 601, 606 (5th Cir. 2010) (declining to group offenses covered by U.S.S.G. §§ 2B5.1 and 2B1.1, respectively).  That is not the case for defendant Wise, whose offenses of conviction are both covered by § 2K2.1.  Indeed, in United States v. Quevedo-Moncada, No. 23-50029, 2024 WL 3082530, at *1 (9th Cir. June 21, 2024), the Ninth Circuit held that a defendant's offenses should be grouped where, like the offenses here, they were covered by the same guideline.

In another case the defendant cites, United States v. Vasco, 564 F.3d 12, 23 (1st Cir. 2009), § 3D1.2(d) was inapplicable because, unlike the firearms offenses involved in this case, the applicable Guidelines section did not involve determining the offense level by reference to a "measure of aggregate harm."  Similarly, although the court in United States v. Jose-Gonzalez, 291 F.3d 697, 707 (10th Cir. 2002), upheld separate consideration of offenses that were enumerated in § 3D1.2(d), the court relied on the Guidelines' "commitment not to group offenses having different human victims" (emphasis added).  And in a case decided after Jose-Gonzalez, the Tenth Circuit clarified explicitly that "§ 3D1.2(d) requires the grouping of multiple counts of offenses that § 2K2.1 covers."  United States v. Garcia, 946 F.3d 1191, 1203 (10th Cir. 2020).

7

Ample precedent exists for grouping the possession of an explosive device (as charged in Count One) with the possession of a firearm (as charged in Count Four). In United States v. Mizrahi, No. 22-CR-504 (E.D.N.Y.) (DLI), which the defendant cites, the court ultimately grouped the possession of ammunition with the possession of an explosive device and directed Probation to submit a second addendum to the PSR reflecting that determination—a fact the defendant fails to mention. In United States v. Barefoot, 754 F.3d 226, 230 (4th Cir. 2014), the Fourth Circuit similarly upheld the grouping of offenses involving destructive devices (in Barefoot, they were pipe bombs) with offenses involving firearms ("predominantly shotguns and rifles") pursuant to § 3D1.2(d). Because the facts and applicable Guidelines sections involved in this case closely match those in Mizrahi and Barefoot, and because the other cases the defendant cites are inapposite for the reasons described above, this Court, too, should group the destructive device count with the firearm count.

IV. A Sentence of 105 Months' Imprisonment Is Appropriate

The government recommends that the Court impose a sentence of 105 months' imprisonment followed by three years of supervised release.

The defendant's actions were extremely dangerous. In all four of the November 2022 incidents outlined above, he committed potentially deadly acts of violence and arson that created a mortal threat to everyone present. He put at risk not only his intended target, but also other people on the street, occupants of nearby businesses (such as a hotel on Glenmore Avenue) and first responders, including the members of the New York City Police Department and the New York City Fire Department who responded to the November 9, 2022 arson of the White U-Haul Van, brought the fire under control, and prevented it from harming anyone. His subsequent decision to arm himself with yet another deadly weapon, a revolver, after multiple custodial sentences for weapons possession and acts of violence further underscores the threat he continues to pose to the public despite those prior sentences.

The defendant's conduct was brazen and demonstrated his belief that he would avoid accountability: he committed these crimes in public and sometimes in broad daylight, including at times when video footage shows that other people and cars were present. He proved that he was determined to avoid capture by speeding away from police officers in a stolen U-Haul van, injuring an innocent bystander and causing property damage along the way, and later by making the extraordinarily audacious choice to run away while in handcuffs. Even after he was incarcerated, he bragged about fleeing from the officers ("Yo, I ran the police over and everything [laughing]. . . . I ran that [N-word] over . . . [I] told 'em, 'Yo, y'all might as well get the fuck out the way, cause I'ma meet y'all at my crib.'") and the lenient punishment that he expected to face ("The gun [is] inoperable, so what you gonna charge me with, you get me? . . . [T]hey gonna drop that down to a E felony, which is gonna break down to a A misdemeanor."). In sum, at every step of the way the defendant acted as if he was above the law and could not be held responsible for his repeated acts of violence.

A significant sentence of imprisonment is also necessary to deter the defendant and to protect the community from further acts of violence by him. The defendant has a long and serious record of using violence to victimize others, see PSR ¶¶ 45 (defendant slapped his wife, prevented her from leaving, and kicked, shoved, and punched law enforcement officers), 46

8

(defendant punched a law enforcement officer), 47 (defendant choked his ex-fiancée), as well as a history of possessing and using firearms and other weapons, see id. ¶¶ 35 (loaded firearm), 41 (unspecified weapon), 43 (attempted robbery in which the defendant broke the victim's arm with a bat). Prior custodial sentences and court supervision have all evidently failed to deter the defendant—indeed, the defendant has not been deterred even within the MDC—and the time served sentence he requests would fail to deter him again and serve only to allow him to harm others sooner. In particular, his history of absconding and refusing to abide by the conditions of his parole make him an exceptionally poor candidate for the sentence he requests, which would impose no additional prison time and require compliance with community supervision alone in the Supervision to Aid Re-entry ("STAR") program.

The defendant argues that the Court should impose a reduced sentence because of the conditions at the MDC, incorrectly claiming that he "did not present disciplinary problems." ECF No. 45 (Defendant's Sentencing Memorandum) at 11. Under the circumstances of this case, this argument should be firmly rejected, as the defendant himself has contributed to hazardous conditions at the MDC through his possession of potentially deadly weapons within his cell. As the Court is well aware, violence at the MDC is a serious concern that puts at risk hundreds of incarcerated defendants in this District and the Southern District of New York. Indeed, deadly weapons such as those possessed by the defendant are essential prerequisites to the most serious violence, such as stabbings and murders of the kind that the defendant cites in seeking a reduced sentence. That violence can be stemmed only if those who engage in such conduct and who, like the defendant, possess the weapons enabling such violence are appropriately punished and deterred. To do otherwise would be to allow the current problems to continue to fester and worsen unabated, all to the great harm of every other inmate and staff member in the institution. Finally, while the defendant's cancer and its development while at the MDC are tragic, any sentence reduction that his illness might merit is encompassed in the recommended sentence of 105 months, which is well below the advisory Guidelines range. Indeed, absent his illness, a sentence at the top of or even above the Guidelines range could well be appropriate in this case given the defendant's unusually brazen conduct and violent history.

V. Conclusion

For the reasons set forth above, the government respectfully submits that a sentence of 105 months' imprisonment followed by three years' supervised release is sufficient but not greater than necessary to achieve the purposes of sentencing.

Respectfully submitted,

BREON PEACE
United States Attorney

By: _____
Andrew M. Roddin
Assistant U.S. Attorney
(718) 254-6455

9